**Ranjit John SINGH; Chand Kumari, a/k/a Chand Kumari Singh; Renika Singh, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 95–70008.

United States Court of Appeals, Ninth Circuit.

Submitted May 14, 1996.*

Decided Sept. 6, 1996.

P. 34(a) and Ninth Circuit Rule 34–4.

Michael Schoenleber, Sacramento, California, for petitioners.

Michelle Gluck, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for respondent.

Before: PREGERSON and TROTT, Circuit Judges, and WINMILL,** District Judge.

PREGERSON, Circuit Judge:

Ranjit John Singh petitions for review of the Board of Immigration Appeals's ("BIA") denial of his application for asylum and withholding of deportation under Sections 208(a) and 243(h) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. §§ 1158(a), 1253(h). We have jurisdiction under 8 U.S.C. § 1105a(a), and we grant the petition for review.

## I

Ranjit John Singh, his wife Chand Kumari Singh, and daughter Renika Singh, are ethnic Indian citizens ("Indo–Fijians") of Fiji.[1] They were admitted to the United States as visitors on May 6, 1989, with permission to remain until November 5, 1989. On June 29, 1989, they applied for asylum with the District Director of the Immigration and Naturalization Service ("INS") in San Francisco.[2] The Asylum Office denied the application and issued an Order to Show Cause why they should not be deported.

On July 18, 1991, the Immigration Judge ("IJ") found Singh and his family to be deportable as charged and denied their application for asylum and withholding of deportation but granted them voluntary departure. The IJ stated that what Singh and his family suffered in Fiji was harassment and discrimination that did not amount to persecution because this sort of treatment was suffered by a "majority of the Indian population remaining in Fiji."

On October 31, 1994, the BIA dismissed Singh's appeal and ordered voluntary departure. The BIA agreed with the IJ that any harassment and discrimination suffered by Singh and his family did not constitute persecution because Singh "failed to establish that anyone in Fiji was interested in him." The

BIA also stated that the treatment Singh suffered did not "constitute[ ] a specific individualized threat."

## II

■ We have held that where the IJ expressly finds certain testimony to be credible, and where the BIA makes no contrary finding, we "accept as undisputed" the testimony given at the hearing before the IJ. *Singh v. Ilchert*, 63 F.3d 1501, 1506 (9th Cir.1995). In this case, the BIA failed to make an express finding concerning Singh's credibility. We, therefore, look to the IJ's decision to determine whether the IJ made an express finding on credibility.

The IJ expressly found Singh's testimony to be credible and consistent and stated that each member of the Singh family "earnestly believes he/she will be persecuted." The IJ's finding was not contradicted by the BIA. In fact, the BIA stated in its opinion that Singh's testimony at the hearing was consistent with the information contained in the asylum application and was corroborated by his wife's and daughter's testimony.

Thus, in resolving this appeal, we take as true all the facts as testified to by Singh and his family. The record before the IJ and the BIA also contains (a) evidence of anti-Indian discrimination, harassment, and violence in Fiji, and (b) evidence of particularized persecution that Singh and his family suffered in Fiji. We summarize this evidence below.

## A

Fiji's population is about evenly divided between ethnic Fijians and Indo–Fijians. Before 1987, Fiji's constitution established a "delicate balance" in favor of ethnic Fijians but guaranteed equal political participation to all groups. In two coups d'etat that occurred in May and July 1987, the Fijian military, a predominantly ethnic Fijian organization, de-

---

** The Honorable B. Lynn Winmill, United States District Judge for the District of Idaho, sitting by designation.

1. Singh's wife, Chand Kumari, and daughter, Renika Singh, are included on his asylum application. They will qualify for asylum derivatively if Singh qualifies for asylum. 8 C.F.R. § 208.21(a).

2. The application was deemed an application for withholding of deportation as well as asylum. 8 C.F.R. § 208.3(b).

posed the existing government dominated by Indo–Fijians. The military stated that its objective was to ensure the political supremacy of ethnic Fijians.

General Sitiveni Rabuka, the leader of the two coups, proclaimed their purpose to be to regain "Fiji for Fijians" and called his political agenda "Fijian Democratic Socialism." Rabuka replaced the president and prime minister with individuals sympathetic to his views. In 1990, the interim government introduced a new constitution ensuring political control by ethnic Fijians. The new constitution guarantees ethnic Fijians a majority of seats in the lower house of Parliament and in the Senate. The new constitution also contains procedures designed to ensure an ethnic Fijian president and ethnic Fijian prime minister.

Since the two coups, Indo–Fijians have been subjected to discrimination, harassment, and violence by ethnic Fijians. The most horrible reported attacks on Indo–Fijians include women raped in front of their children, political opponents brutally beaten, detainees forced to walk naked in the streets while holding human excrement, people forced to swim in sewage ponds, and children stripped and beaten for Sunday curfew violations and forced to rub their noses against a concrete floor until their noses bled. Ethnic Fijian youth gangs have raided, stoned, and fire bombed Indo–Fijian homes. In 1989, five Hindu temples were burned. In October 1990, an Indian school was burned.

The government in power in Fiji appeared to encourage and condone the discrimination, harassment, and violence inflicted by ethnic Fijians against Indo–Fijians. The police department, primarily composed of ethnic Fijians, did little to protect the Indo–Fijian population.

We note, however, the State Department's *Country Report on Human Rights Practices for 1990* indicates that at least as of 1989 (two years after the coups), governmental authorities were responding to a few high-profile cases of ethnically motivated crime. But we hasten to add that this report does not make clear whether the government punished such criminals in a manner commensurate with their crimes or instead merely slapped them on their wrists.

**B**

At the time of the 1987 coups, Singh was employed as general manager of a shipping company in Suva, Fiji's capital city. He was the only Indo–Fijian at this supervisory level in any shipping company in Fiji. By virtue of this position, he was also a member of a shipping committee composed of the general managers of the six shipping companies in Fiji. This committee met monthly, and at these meetings Singh advocated opening up dock worker positions to all races rather than just ethnic Fijians, who had traditionally received preferential hiring.

Singh testified that his support for nondiscriminatory hiring resulted in groups of ethnic Fijian dock workers making direct threats on his life. These death threats began in August 1987, after the coups, and escalated through December 1987. Singh was told that if he did not leave his job as general manager of the shipping company, he would be killed. The ethnic Fijian dock workers threatened to kill him by either dropping a cargo pallet on him or by "other means" if he did not leave. In September 1987, a gang of ethnic Fijian dock workers told Singh that his house would be burned and his wife and daughter "finish[ed] off" if he didn't leave the job.

The threats were followed by attempts to kill or scare Singh and to harm his family. In November 1987, while Singh was walking on a wharf, ethnic Fijian dock workers dropped two loaded cargo pallets nearly on top of Singh. In December 1987, a gang of ethnic Fijians threatened Singh at knifepoint. The same gang that threatened Singh at work came to his house. The gang threw stones at his house and threatened his wife and daughter with burning the house. At the end of December 1987, fearing for his family's safety, Singh quit his job at the shipping company, left his house in Suva, and temporarily moved his family 110 miles away.

After leaving his job, Singh opened up a grocery shop near Suva. Singh's family stayed away for two months, then moved

back to a town near Suva so that his daughter could resume school. The Singh family did not return to the house they owned in Suva. Instead, they rented a house in Nasinu, near Suva.

Despite these precautions, the threats and violence resumed as soon as the family returned to the Suva area. In August 1988, while Singh's wife and daughter were at home alone, four ethnic Fijian men tried to break into the house at night. The men broke a window, waking Singh's daughter. Singh's daughter ran to her mother, and they started to scream. The attackers then tried to force the door open, breaking the bolt and chanting "rovadi dena," meaning that they were going to rape Singh's wife. The screams of Singh's wife and daughter alerted their neighbors and scared off the attackers.

In November 1988, an ethnic Fijian assaulted and threatened Singh in his shop. The man took a pack of cigarettes and, when Singh asked him to pay, the man became violent. He grabbed Singh, holding him under a kerosene pump, and threatened to light him on fire. The man told Singh, "you are an Indian and ... I don't want you here, I don't want to see your presence." The man then shoved Singh against a 44–gallon drum, injuring his ribs. Before leaving Singh's shop, the man told Singh that another Indo–Fijian's shop nearby had been burned down two weeks earlier, and if Singh didn't leave, the same thing would happen to him.

Singh reported each of these threats and attacks to the police. Even though he provided names of the attackers in many instances, the police did not respond to any of his crime reports.

### III

■ Where, as here, the BIA conducts its own review of the record, we review the BIA's decision rather than the IJ's decision. We review de novo the BIA's "determination of purely legal questions regarding the requirements" under the Act. *Abedini v. INS,* 971 F.2d 188, 190 (9th Cir.1992). Assuming the BIA committed no legal errors, we review the BIA's factual findings for substantial evidence and uphold them if " 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *Prasad v. INS ("Prasad I "),* 47 F.3d 336, 338 (9th Cir.1995) (quoting *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992)). To reverse the BIA's factual findings, we must find that "the evidence compels a contrary conclusion." *Prasad v. INS ("Prasad II "),* 83 F.3d 315, 318 (9th Cir.1996).

### IV

■ To qualify for asylum, an applicant must establish "refugee" status. 8 U.S.C. § 1158(a). A "refugee" is defined under the Act as a person "who is unable or unwilling to return to ... [his or her] home country because of persecution *or* a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). Even where an applicant qualifies for asylum, the grant of asylum remains within the discretion of the Attorney General. 8 U.S.C. § 1158(a). Such discretion, however, must be exercised "within the constraints of the law." *Singh v. Ilchert,* 69 F.3d 375, 380 (9th Cir.1995).

■ In this case, the BIA held that the harassment, assaults, and death threats testified to by Singh and his family did not amount to persecution because the incidents "arose not out of any of the respondent's individual circumstances but rather was part of and parcel of the general level of violence and danger directed against Indo–Fijians following the 1987 coup." In effect, the BIA disqualified Singh from asylum eligibility merely because other Indo–Fijians were subject to the same discrimination, harassment, and violence following the coups. The BIA was wrong in its assessment.

■ We have defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Prasad I,* 47 F.3d at 339. While a single incident in some cases may not rise to the level of persecution, the cumulative effect of several incidents may constitute persecution. *Shirazi–Parsa v. INS,* 14 F.3d 1424, 1428

(9th Cir.1994), *overruled on other grounds by Fisher v. INS,* 79 F.3d 955, 963 (9th Cir. 1996) (en banc). Discrimination, harassment, and violence by groups that the government is unwilling or unable to control can also constitute persecution. *Arteaga v. INS,* 836 F.2d 1227, 1231 (9th Cir.1988).

In some cases, a showing by the applicant of individualized persecution is not required to establish a well-founded fear of persecution. The INS adopted a regulation in 1990 that specifically states that an applicant is *not* required to show that he has been "singled out individually for persecution ... if he establishes that there is a pattern or practice in his country ... of persecution of groups of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.13(b)(2)(i).[3]

In approving this regulation, we held that, even where an applicant fails to establish a "pattern or practice" of persecution of a particular group, the severity of the discrimination, harassment, or violence directed at members of that group will determine the kind of individualized showing that will be required of an asylum applicant, who is a member of that group. *Kotasz v. INS,* 31 F.3d 847, 853 (9th Cir.1994). As we explained in *Kotasz,* "although members of the disfavored group[ ] are not threatened by systematic persecution of the group's entire membership, the fact of group membership nonetheless places them at some risk." *Id.*

"Proof that the government or other persecutor has discriminated against a group to which the [applicant] belongs is, accordingly, *always* relevant to an asylum case." *Id.* The more the group to which an applicant belongs is discriminated against, harassed, or subjected to violence, the less

the individualized showing an applicant must make to establish eligibility for asylum. *Id.* In other words, if an applicant establishes membership in a particular group, evidence that the group has been targeted with discrimination, harassment, or violence strengthens the applicant's case. Such evidence is relevant to show that there is a pattern of persecution directed at the particular group, and that there is a reasonable likelihood that the applicant, as a member of that group, will be personally persecuted if he is deported to his home country.

Thus, we reject the notion that an applicant is ineligible for asylum merely because all members of a persecuted group might be eligible for asylum. Moreover, whether discrimination, harassment, or violence directed at a particular group on account of a protected ground is sufficiently offensive to constitute persecution under the Act must be decided on a case-by-case basis.

Our recent en banc decision, *Fisher v. INS,* 79 F.3d 955, 963 (9th Cir.1996) (en banc), does not dictate otherwise. In *Fisher,* we stated that "[p]ersecution is an extreme concept, which *ordinarily* does not include '[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be.'" 79 F.3d at 961 (quoting *Ghaly v. INS,* 58 F.3d 1425, 1431 (9th Cir.1995)) (emphasis added). This statement does not mean that discrimination, harassment, or violence directed at members of a particular group can never rise to the level of persecution. In *Fisher,* we did not address the circumstances in which discrimination, harassment, or violence directed at members of a particular group, in that case women, would constitute persecution within the meaning of the Act. 79 F.3d at 966 (Canby, concurring). We simply held that there was *no evidence in the record* that the Iranian government enforced

---

3. The regulation provides that:

(i) In evaluating whether the applicant has sustained his burden of proving that he has a well-founded fear of persecution, the Asylum Officer or Immigration Judge shall not require the applicant to provide evidence that he would be singled out individually for persecution if:

(A) He establishes that there is a pattern or practice in his country of nationality or last

habitual residence of persecution of groups of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) He establishes his own inclusion in and identification with such group of persons such that his fear of persecution upon return is reasonable.

8 C.F.R. § 208.13(b)(2)(i).

its rules regarding conduct and dress to punish the applicant for her religious and political views. *Id.* at 962–963.

In this case, Singh introduced evidence showing that, after the 1987 coups, Indo–Fijians were targeted with discrimination, harassment, and violence on account of their race. As the IJ found: "The Country Reports on Human Rights Practices for 1990 published by the Department of State regarding Fiji verify that Indians are subject to significant harassment and crime based on race compounded by inadequate police protection. . . . [T]his documentation substantiates . . . that there is a concerted effort being made by the native ethnic Fijians to harass and humiliate the Indians living in the country." Whether this evidence by itself is sufficient to establish a "pattern or practice" under 8 C.F.R. § 208.13(b)(2)(i) we need not resolve today, because we conclude that Singh and his family are eligible for asylum based on the past persecution they suffered in Fiji.

Singh and members of his family testified that before they fled Fiji they were harassed, assaulted, and threatened because they are Indo–Fijian. Singh was told that if he did not quit his job as the only Indo–Fijian shipping general manager in Fiji, he would be killed and his wife and daughter "finish[ed] off." Shortly thereafter, loaded cargo pallets were dropped nearly on top of Singh as he walked on the wharf. On another occasion, a gang of ethnic Fijian dock workers threatened Singh at knife-point. This same gang went to Singh's house and threatened his wife and daughter with burning their house. After Singh quit his job and fled with his family to a nearby town, an ethnic Fijian attacked Singh because he is Indo–Fijian, held his head under a kerosene pump, and threatened to light him on fire and torch his business if Singh did not leave. There was a further incident where four ethnic Fijians threatened Singh's wife and daughter with rape while they tried to break into Singh's new home.

Based on this credible and detailed testimony, we conclude that the BIA erred when it determined that Singh was not eligible for asylum. We believe that any reasonable finder of fact would be compelled to conclude that Singh and his family suffered past persecution on account of their race. There is no question that persistent death threats and assaults on one's life, family, and business rise to the level of persecution within the meaning of the Act.[4]

The INS, however, contends that Singh is not eligible for asylum because there is no evidence that the persecution suffered by Singh and his family was committed by an "organized or quasi-governmental group." We disagree with the INS's legal premise. Persecution meted out by groups that the government is unable or unwilling to control constitutes persecution under the Act. *Arteaga*, 836 F.2d at 1231. Non-governmental groups need not file articles of incorporation before they can be capable of persecution.

In this case, Singh testified that he reported each assault and threat to the police and that, although Singh identified his assailants by name, the police failed to respond to any of his crime reports. This failure by the authorities to protect Singh and his family clearly indicates that the police either could not or would not control the ethnic Fijians who threatened Singh and his family.

The record shows that the government has encouraged and condoned the discrimination, harassment, and violence by ethnic Fijians against Indo–Fijians. The interim government adopted a new constitution which institutionalizes discrimination against non-ethnic Fijians and guarantees ethnic Fijians political control of the government. Finally, we note that the police department, which does little to protect Indo–Fijians, is composed primarily of ethnic Fijians. Based on the record before us, we find that Singh suffered past persecution within the meaning of the Act.

A finding of past persecution triggers a regulatory presumption that the applicant

---

4. Nothing in this opinion should be construed to mean that an applicant must experience the severe level of persecution suffered by Singh and his family to be eligible for asylum based on past persecution.

has a well-founded fear of future persecution, which provisionally establishes the applicant's refugee status and eligibility for asylum. 8 C.F.R. § 208.13(b)(1)(i). To rebut this presumption, the INS must show by a preponderance of the evidence that, "since the time the persecution occurred conditions in the applicant's country of nationality ... have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted were he to return." *Id.*

Some forms of past persecution also trigger another regulatory presumption that the applicant is entitled to withholding of deportation. If an applicant's "life or freedom was threatened in the proposed country of deportation ..., it shall be presumed that his life or freedom would be threatened on return to that country...." 8 C.F.R. § 208.16(b)(2). This presumption is rebutted only if "a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there." *Id.*

Because the BIA incorrectly found that Singh did not suffer past persecution, it failed to reach the question whether the INS had presented sufficient evidence to rebut either of the two regulatory presumptions. Given the record before us and because the BIA never applied the regulatory presumptions, we think it appropriate to remand this case. On remand, the BIA should allow the parties to supplement the record with evidence of current conditions in Fiji, and determine whether the INS can rebut, *by a preponderance of the evidence,* the regulatory presumptions regarding eligibility for asylum and entitlement to withholding of deportation.

## V

We conclude that Singh clearly suffered past persecution on account of race. Our conclusion triggers the two regulatory presumptions one for asylum and another for withholding of deportation. We REMAND to the BIA to determine whether the INS can produce evidence required to rebut these presumptions and for such further proceedings as are necessary to determine Singh's immigration status. Petition GRANTED. REMANDED to the BIA for further proceedings.