Maya AVETOVA–ELISSEVA,
Petitioner,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

No. 98–70547.

United States Court of Appeals,
Ninth Circuit.

Submitted Feb. 7, 2000.[1]

Filed May 15, 2000.

As Amended June 26, 2000.

---

**1.** The panel unanimously finds this case suitable for decision without oral argument. See Fed. R.App. P. 34(a)(2).

S. Austin Johnson, Bradford, Brady & Johnson, Provo, Utah, for the petitioner.

Marshall Tamor Golding, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: PREGERSON and WARDLAW, Circuit Judges, and SHADUR, District Judge.[2]

Opinion by Judge SHADUR; Dissent by Judge WARDLAW.

SHADUR, District Judge:

Maya Avetova–Elisseva ("Avetova"), a 62 year-old Armenian native and citizen of both Azerbaijan and Russia, petitions for review of a final decision of the Board of Immigration Appeals ("BIA") affirming the denial by an immigration judge ("IJ") of her application for asylum and withholding of deportation. Avetova claims that she suffered persecution in Russia on account of her Armenian ethnicity and Mormon faith and that she has a well-founded fear of future persecution if she were returned to that country.[3] We have jurisdiction under 8 U.S.C. § 1105a(a)[4] and, for the reasons given below, we grant Avetova's petition.

### Eligibility for Asylum

Under Section 1158(b) the Attorney General has discretion to grant asylum to aliens who qualify as statutory "refugees." In turn, Section 1101(a)(42)(A) defines a "refugee" as an alien who is "unwilling or unable" to return to the alien's home country "because of [past] persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." While "[a]n alien who establishes past persecution is presumed to have a well-founded fear of persecution .... [that] presumption may be rebutted where the conditions in the country have significantly changed" *Pitcherskaia v. INS*, 118 F.3d 641, 646 (9th Cir.1997) (citation omitted).

---

**2.** Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

**3.** In view of her dual citizenship, the IJ separately considered deportation to Azerbaijan and to Russia. Because the IJ granted Avetova's petition to withhold deportation to Azerbaijan and the Immigration and Naturalization Service ("INS") has not sought to review that decision, the issue is not before us.

**4.** All citations to Title 8 provisions will take the form "Section-," omitting the prefatory "8 U.S.C." Although the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("Reform Act") has replaced Section 1105a with Section 1252, the new review provision does not apply to petitioners such as Avetova whose deportation proceedings commenced before April 1, 1997. Instead, because a final order of deportation was entered against her after October 30, 1996, the Reform Act's transitional rules apply (see Reform Act § 309(c)(1)). Hence we still have jurisdiction under Section 1105a(a).

 Any alien who premises an asylum claim on a well-founded fear of persecution must demonstrate a subjectively genuine and objectively reasonable fear *Arriaga–Barrientos v. INS*, 937 F.2d 411, 413 (9th Cir.1991). While the subjective component is satisfied by "showing that the alien's fear is genuine" *id.*, the objective component requires "credible, direct, and specific evidence in the record that would support a reasonable fear of persecution" *Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998) (internal punctuation and source reference omitted).

 For a sustainable showing of past persecution, a "[p]etitioner must establish that the mistreatment she suffered ... was substantially more grievous in kind or degree than the general manifestation of hostility between ... competing ethnic and religious groups ..." *id.* at 967. But as to the requisite fear of future persecution, *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir.1999)(internal quotation marks, punctuation and citations omitted) teaches:

> [T]he applicant is not required to show that she would be singled out individually for persecution if there is a pattern or practice of persecution of groups of persons similarly situated and she can establish her own inclusion in the group such that her fear of persecution upon return is reasonable. Thus, if [an applicant] is able to show a "pattern or practice" of persecution against a group of which she is a member, then she will be eligible for asylum.

Finally, affirmative state action is not necessary to establish a well-founded fear of persecution if the government "is unwilling or unable to control those elements of its society responsible for targeting" a particular class of individuals *id.* at 1036.

## Standard of Review

 Adverse BIA asylum decisions are upheld if supported by "substantial evidence" (see *Singh*, 134 F.3d at 966). Under that deferential standard "a petitioner contending that the Board's findings are erroneous must establish that the evidence not only *supports* that conclusion, but *compels* it" *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995)(internal quotation marks omitted and emphasis in original).[5] Though limited to reviewing the administrative record, we consider the record in its entirety, including evidence that contradicts the BIA's findings *Velarde v. INS*, 140 F.3d 1305, 1309 (9th Cir.1998).

## Background

Avetova was born in Baku, Azerbaijan. In 1990 she and her family fled Baku to escape the Azeri campaign to cleanse Azerbaijan of Armenians and Russians.[6] With the help of Soviet troops they crossed the Caspian Sea and were ultimately evacuated to Moscow. But Russia proved to be only slightly more hospitable to Avetova, for she and her friends were victims of numerous incidents of harassment due to their Armenian ethnicity and Mormon faith.

In December 1993 Avetova entered the United States legally to be with her ill sister. In April 1996, one month after her visa expired, she conceded deportability but applied for asylum and withholding of deportation. On October 30, 1996 the IJ, in an oral decision, found Avetova's testimony to be credible but, while granting her application for withholding of deporta-

---

**5.** As *Singh*, 134 F.3d at 966 (internal quotation marks and citations omitted) puts it:

> This strict standard bars a reviewing court from independently weighing the evidence and holding that petitioner is eligible for asylum, except in cases where compelling evidence is shown. Thus, we must deny the Petition unless Petitioner presented evidence so compelling that no reasonable factfinder could find that Petitioner has not established eligibility for asylum.

**6.** Azeris led multiple movements (pogroms) to rid Azerbaijan of all "foreigners." As the BIA found, the 1990 pogrom involved the Azeris entering "private homes, beating, evicting and even killing Armenians and Russians." In 1988 Avetova's Russian husband had suffered permanent injuries in a pogrom.

tion from Azerbaijan, denied it as to Russia. Avetova filed a timely administrative appeal that the BIA denied on April 22, 1998. This petition followed.

### Avetova's Fear of Future Persecution

At issue is whether the record compels a finding that Avetova has a well-founded fear of future persecution because of her Armenian ethnicity.[7] On that score the BIA simply stated:

> While the respondent testified to incidents of harm suffered by Mormons and Armenians in Russia, the record does not reflect that there exists in Russian a pattern or practice of persecution of persons on the basis of Armenian ethnicity or membership in the Mormon faith.

Although the BIA's opinion does not expressly state whether or not it was conducting a de novo review, its phrasing seems in part to suggest that it did conduct an independent review of the record. If that were the case, it would be the BIA's decision that we review (see *Vongsakdy v. INS*, 171 F.3d 1203, 1206 (9th Cir.1999)). But the lack of analysis that the BIA opinion devoted to the issue at hand-its simple statement of a conclusion-also suggests that the BIA gave significant weight to the IJ's findings. In light of that ambiguity, we will also look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion.

Any petitioner in Avetova's position may create a rebuttable presumption of an objective fear of future persecution by demonstrating past persecution (see, e.g., *Marcu v. INS*, 147 F.3d 1078, 1081 (9th Cir.1998)). In support of her claim of past persecution because she is an Armenian, Avetova recites several incidents:

(1) she was harassed and pushed by Russian officers because of her ethnicity;[8] (2) she could not get a job even though she had a diploma because "there were no jobs for Armenians"; and (3) her friend's daughter (who was Armenian) was raped and beaten by police officials. Although such experiences may certainly contribute to a petitioner's state of mind (to satisfy the subjective component) and, if adequately supported, may also provide the required showing of an objectively reasonable fear of future persecution, we agree with the BIA that these incidents of hostility alone do not amount to "persecution" (that is, past persecution) within the meaning of the statute.

In terms of the fear of future persecution, there is no question that Avetova satisfies the subjective component of the two-part test. As the IJ said after listening to and witnessing her testimony, Avetova demonstrates a "high degree of fear and ... emotionalness [sic]." Summarizing the "background materials" in the case, the IJ said that the objective evidence established this:

> [T]here is harassment, discrimination, and mistreatment of people of Armenian descent in Russia; in particular, Moscow, because of the problems that that city has encountered after the fall of the Soviet Union. However, the background materials indicate that the inability of the police to sometimes deal with these problems, is not due to the fact that the police is [sic] participating in the persecution or harassment but, rather, because of lack of resources and a very high crime rate, which leads the police to only prosecute those cases where the evidence is abundantly

---

7. Because we ultimately hold that a such well-founded fear exists, we need not resolve the question whether such a fear also exists because of Avetova's Mormon faith. It is worth adding, though, that Avetova's "outsider" status as an Armenian can only be worsened by her membership in a second minority group (this one religious)-and the same expert witness who directly supports the required objective component as to Avetova's ethnicity, the reasonableness of her fear of persecution as an Armenian, also provides like support regarding her Mormon faith.

8. Specifically, Avetova was pushed around and was asked for her internal passport, and when it was discovered that she was Armenian she was told that the soldiers were "sick and tired" of "all these invaders."

clear.... The evidence is not one that shows that the government is systematically engaging in these acts or tolerating the people that do engage in acts of discrimination and harassment, deliberately to persecute Armenians because of the fact that they are Armenian.

In other words, the IJ conceded that "there is [9] harassment, discrimination, and mistreatment of people of Armenian descent in Russia," but that the Russian government is powerless to stop that harassment.[10]

Though it is not clear exactly what "background materials" the IJ relied upon, it would appear that significant weight was given to the *Profile of Asylum Claims and Country Conditions (1995)* prepared by the State Department's Office of Asylum Affairs. That report, which mirrors most of the IJ's sentiments, states unequivocally that protection from ethnic harassment is generally unavailable in Russia because the "Russian police ... is [sic] *clearly incapable* of coping with the situation" (emphasis supplied).[11]

 It does not matter that financial considerations may account for such an inability to stop elements of ethnic persecution. What matters instead is that the government "is unwilling or *unable* to control those elements of its society" committing the acts of persecution *Mgoian,* 184 F.3d at 1036(emphasis added).[12] Indeed, any lack of funding might be labeled as a governmental choice (contrast the current Russian military campaign in Chechnya).

But we need not rest solely on the inability-to-control concept, for there is compelling evidence that at least tacit government sponsorship is involved in the harassment[13] of Armenians. In part the State Department's 1996 report on country conditions in Russia says that in 1995 "[s]ome members of the security forces continued to commit human rights abuses," going on to say:

> With wide public support, law enforcement authorities targeted people with dark complexions for harassment, arrest, and deportations from urban centers during periods of domestic crisis. This trend continued in 1995. Human Rights Watch reported that law enforcement agents in Moscow "routinely detained, intimidated and extorted money from and beat people of color, mainly

---

**9.** This opinion also consistently employs the present tense to describe the situation in Russia. We recognize of course that because Avetova's hearing took place in 1996, the situation may since have changed. While it is unfortunate that the law's processes cause this decision to be rendered more than three years after Avetova's initial hearing, we must consider the facts in the administrative record as if they speak to the current situation. Indeed, any remand in such circumstances would be extremely unfair to litigants, potentially triggering multiple determinations and repeated appeals as to whether there is any "current" persecution-a sort of Zeno's Paradox in which the arrow could never reach the target. This differs from a determination of past persecution, where remand is necessary to determine whether conditions in a country have changed.

**10.** Because there is no question that Avetova is Armenian, she merely has to demonstrate that Armenians are being systematically persecuted (see, e.g., *Mgoian,* 184 F.3d at 1035).

**11.** That report also says that the "action or inaction [of the police] appears more closely tied to the seriousness of the complaint and the likelihood that the perpetrator will be apprehended, than to the ethnicity, religious views, or political affiliations of the victim." But that conclusion is called into question by the State Department's later country condition report discussed below.

**12.** For example, in *Singh v. INS,* 94 F.3d 1353, 1360 (9th Cir.1996) an Indo-Fijian family was threatened and harassed by gangs of ethnic Fijians, and the police did nothing when those incidents were reported. Noting that "[p]ersecution meted out by groups that the government is unable or unwilling to control constitutes persecution under the Act," we said that the "failure by the authorities to protect Singh and his family clearly indicates that the police either *could not* or would not control the ethnic Fijians who threatened Singh and his family" *id.* (emphasis added).

**13.** We reserve until later our discussion as to whether such "harassment" equates to "persecution" under the statute.

people from the Caucasus and Central Asia...." [14]

That quoted report from Human Rights Watch, based on that group's investigation of racist attacks by Moscow law enforcement personnel, also states:

[L]aw enforcement authorities in Moscow ... are not only failing to uphold Russia's obligations to fight racial discrimination but indeed, for approximately the past three years, have been conducting a campaign of harassment and brutality against dark-skinned people. State-sponsored abuse includes restriction of freedom of movement, including arbitrary detention, arbitrary house searches and invasion of privacy, extortion, and physical assault.... Although no reliable statistics are available, it appears that the most frequent victims of state-sponsored, ethnically motivated attacks are [among others,] people from the Caucasus Mountains (Armenians, Azerbaijanis, Chechens, Georgians, Kurds and others).[15]

Avetova also introduced the testimony of Dr. Dennis Papazian, an expert on Armenians in Russia.[16] While it was undisputed that Dr. Papazian was extremely well informed about the *current* plight of Armenians in Russian, the IJ limited his submission to affidavit form because the IJ labeled live testimony as "cumulative." Dr. Papazian's affidavit stated in part:

I have read the affidavit of Maya Eliseeva [sic].... Based on my expert knowledge of conditions affecting Armenians in the Russian Federation, as well as

Mormons, I can affirm that she would face a strong likelihood of persecution, possibly resulting in physical harm or death, if she were forced to return to the Russian Federation.... It is a sign of the breakdown of civil society in the Russian Federation and of the government's inability, or unwillingness, to protect its citizens that some Armenians in the Russian Federation experience only mild discrimination, while others face life-threatening persecution without there being any distinction between the activities of the individuals concerned.... The personal incidents which Maya Eliseeva describes in her affidavit are entirely consistent with the extreme abuses experienced by many Armenians in the Russian Federation.... I see nothing in the near future which would suggest that persecution of some Armenians and almost all Mormons will be ameliorated, due to religious antagonism, the instability of the Russian government, the present struggle for power, the natural prejudice of the Russians against dark-skinned people, and the persistence of regional and ethnic conflicts in the Russian Federation and its neighboring successor states. The arbitrary local and regional imposition of the propiska system [17] continues to result in the persecution of specific groups, such as Armenians, and specific individuals, such as Maya Eliseeva.

That statement strongly reinforces the record evidence of Armenian harassment by elements of the Russian government.[18]

---

14. Armenians are from the Caucasus.

15. While that report noted that "the Government of the Russian Federation has shown sensitivity to increases in ethnic hostilities and has taken steps to combat this dangerous trend," the federal government and some municipalities "have adopted legislation that has formed the basis for the Moscow police's racially motivated attacks."

16. Dr. Papazian (the "Dr." denotes a Ph.D. degree) is the Director of the Armenian Research Center at the University of Michigan at Dearborn.

17. That system involves the use of residence permits that determine where citizens may reside and that are necessary to get legal jobs and housing. Those permits classify citizens by race and ethnicity and also serve the ostensible purpose of tracking people for law enforcement purposes.

18. While the IJ seemed to discount Dr. Papazian's comments regarding Azerbaijan because they were "highly conclusory in nature," the IJ made no mention at all of his statements as to the persecution of Armenians in Russia. It is particularly troubling to find Dr. Papazian's opinions, which were the most

In rejecting Avetova's claim of a well-founded fear of future persecution, both the IJ and the BIA noted several factors said to cut the other way: Russia's army rescued Avetova and other Armenians from Azerbaijan; Avetova's husband receives a pension from the Russian government because of injuries he suffered in Azerbaijan; she received a Russian passport and used that passport to come to this country not to flee from persecution, but to assist her ill sister.[19] It is not this Court's role, of course, to weigh the evidence in cases such as this, and we do not do so here. Instead, because fear of the future is at issue, we have already explained why the uncontroverted evidence from Dr. Papazian must perforce trump more attenuated inferences from the past. But even on their own terms, the other factors referred to in this paragraph lose force under closer scrutiny.

First, just because the Russian army rescued Avetova and other Armenians from a likely death in Azerbaijan does not negate the prospect of future persecution that is less than life-threatening-or even of life-threatening persecution from elements that the government cannot control. It is also apparent from the record that the views of the Russian government toward Armenians have changed over time as the flood of Armenian refugees have altered the social, and in turn the political, landscape.[20] Finally, on the record evidence the Russian government is not an entity with a single attitude toward Armenians. As the record reveals, it was officials in Moscow (in contrast to national officials) who were the primary persecutors of Ar-

menians. All of these things also contraindicate ascribing meaningful significance to the fact that Avetova received a Russian passport.

Further, the fact that Avetova's husband receives a government pension is not enlightening at all-he is after all a native of Russia, not Armenia. Finally, though Avetova initially came to the United States to assist her ill sister and not to flee persecution, that simply enables us to pause to take a deep look at a petitioner's claim. It is not a reason to discount compelling evidence-in this instance, Dr. Papazian's evidence-of persecution.

What has been said here is not at odds with the statement in *Singh*, 134 F.3d at 969 that a petitioner's claim was "undercut" by the fact that she came to the United States five years after the alleged persecution began and decided to file for asylum because "she liked it here and decided to stay." As *Singh, id.,* reasoned, "[o]ne would expect that if Petitioner truly had experienced persecution, she would have left the country earlier and would have not intended to return." But once again we are focusing here not on the sufficiency of proof as to Avetova's *past* persecution, but rather on the total situation as to the fear of *future* persecution. And in that respect, while demonstrating past persecution does create a rebuttable presumption of a fear of future persecution, reliance on such a presumption is not the only path for a petitioner to travel. Rather the true litmus test for the statutory concept fear of future persecution-is the

---

current and particularized in the record and hence the most salient evidence as to Avetova's potential future in Russia, discounted in that fashion. If there were really concerns as to the affidavit's "conclusory ... nature," Dr. Papazian was readily available as a live witness.

**19.** Without any support in the record, the IJ states that Avetova filed for asylum only "after being in the United States and seeing the kind of freedom she enjoyed in this country to practice her Mormon religion and the lack of any harassment or problems because of her

Armenian ethnicity." If that is somehow intended to cast a cloud on the credibility of Avetova's subjective fears (rather than revealing something about the IJ's mindset), it is really undercut by the IJ's observation that Avetova exhibited a "high degree of fear and ... emotionalness" during her testimony.

**20.** Indeed, it appears that this is exactly what happened. As the United States' own brief notes, the "substantial Russian resentment of and hostility against all Caucasians ... has been exacerbated by the influx of refugees from the various ethnic conflicts."

two-pronged subjective and objective standard that we have been discussing here.

To that end it does not suffice for the government to advance the "substantial evidence" standard on appeal as an attempted bulwark against any and all attack. Despite the height of that standard, it cannot substitute for a reasoned explanation as to why the overwhelming evidence of Armenian harassment and, at the very least, Russian governmental indifference does not entitle Avetova to prevail. Indeed, the United States is unpersuasive in its effort to rely solely on Avetova's testimony, coupled with the standard of review, while at the same time it fails to counter that evidence of Armenian harassment and Russian governmental involvement.

■ In sum, having given the United States the required benefit of the doubt in construing the record, we are nonetheless compelled by credible, direct and specific evidence to conclude that elements of the Russian government are either supporting or are unwilling or unable to stop a pattern and practice of Armenian harassment in Russia-one that for Avetova herself would create "a strong likelihood of persecution, possibly resulting in physical harm or death, if she were forced to return to the Russian Federation" (Dr. Papazian's uncontroverted expert view). We are of course mindful of 8 C.F.R. § 208.13(b)(2) and of its explication in *Kotasz v. INS*, 31 F.3d 847 (9th Cir.1994), relied on by the dissent. In our view, two factors demonstrate the inapplicability of those references to defeat Avetova's claim:

1. As for the regulation, it brings the "pattern or practice" requirement into play only as an alternative to an applicant's showing "that he or she would be singled out individually for persecution." Here Avetova's past experiences and Dr. Papazian's express affirmance as to her

*personal* future risk plainly satisfy the quoted standard.

2. As for the "pattern or practice" alternative itself, we do not view it as requiring a showing of universality-a showing that *every* individual in the vulnerable group must face such serious persecution. Here the evidence of substantial group persecution (again reflected in Dr. Papazian's affidavit), coupled with Avetova's special circumstances (including her past individual experiences), suffices. Under those circumstances we cannot justify subjecting Avetova to the serious gamble that she *might* perhaps escape the fate that the expert opinion evaluates as a "strong likelihood."

■ In both of those respects, we believe that it is entirely consistent to determine on the one hand that a petitioner's past harassment during a closed time period had not reached the legal level of "past persecution," so as to defeat relief on the ground of that past persecution alone,[21] and yet to determine that although such past experiences did not themselves reach that legal level, they are sufficiently probative of a singling out of the petitioner so that an established current pattern of persecution of members of the group to which she belongs carries the personalized threat of *her* future persecution (once again in the legal sense) if she were sent back to the place where such persecution is practiced. Suppose for example another Armenian expatriate from Russia whose past existence in that country had been wholly uneventful-such a person would fall into the category of what Dr. Papazian has referred to as "some Armenians in the Russian Federation [who] experience only mild discrimination" and who therefore face no demonstrable future threat justifying asylum in the United States. By contrast, Avetova's past unpleasant experiences cou-

---

21. On that score, a converse determination that past persecution *had* been proved would not necessarily resolve a petitioner's claim. In such event, the INS may still argue that current country conditions do not carry the prospect that such past persecution will continue in the future (8 C.F.R. § 208.13(b)(1)(i); and see, e.g., *Reyes–Guerrero v. INS*, 192 F.3d 1241, 1244–45 (9th Cir.1999)).

pled with the overall risks that Dr. Papazian had identified without contradiction totally justify his "affirm[ation] that *she* would face a strong likelihood of persecution, possibly resulting in physical harm or death, if *she* were forced to return to the Russian Federation" (emphasis added).

This analysis meshes seamlessly not only with the post-*Kotasz* statement in *Mgoian* quoted earlier in this opinion but also with *Mgoian*'s alternative explication (citations to *Kotasz* itself omitted) at 184 F.3d at 1035 n. 4:

> [I]f the applicant is a member of a "disfavored" group, but the group is not subject to systematic persecution, this court will look to (1) the risk level of membership in the group (i.e., the extent and the severity of persecution suffered by the group) and (2) the alien's individual risk level (i.e., whether the alien has a special role in the group or is more likely to come to the attention of the persecutors making him a more likely target for persecution). The relationship between these two factors is correlational; that is to say, the more serious and widespread the threat of persecution to the group, the less individualized the threat of persecution needs to be.

We therefore do not view *Kotasz,* as does the dissent, as casting any cloud on the conclusions reached here.

In short, there is only scant evidence to cast doubt on the possibility of actual governmental support of harassment that would pose a "strong likelihood" of physical harm or death to Avetova-and more importantly, *nothing* in the record contradicts the conclusion of governmental unwillingness or inability to stop such harassment. Hence Avetova has demonstrated an objectively reasonable, as well as subjective, fear.

As suggested by what has just been said, we also hold that the demonstrated harassment of Armenians in Russia amounts to "persecution" under Section 1101(a)(42)(A).[22] Again no evidence was proffered by the INS to suggest the absence of such hostile treatment of Armenians in Russia. While not all harassment rises to the statutory level of "persecution," here the detention, intimidation and beatings of Armenians because of their ethnicity, as described in the record, involves "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive" *Ghaly,* 58 F.3d at 1431 (quotation marks and citation omitted). To the extent that the BIA or the IJ might be perceived as having decided differently (a doubtful premise, see n.20), that could not be viewed as supported by substantial evidence.

### Conclusion

We hold that the BIA's decision not to grant asylum or to withhold deportation to Russia lacks the support of substantial evidence. Any reasonable finder of fact would be compelled to conclude that Avetova has a well-founded fear of future persecution in Russia because of her being Armenian. We therefore GRANT Avetova's petition and REMAND this case to the BIA with directions to grant Avetova's petition for withholding of deportation and to present this matter to the Attorney General for the exercise of her discretion under Section 1158(b).

PETITION GRANTED.

WARDLAW, Circuit Judge, dissenting:

In finding Maya Avetova–Elisseva ("Avetova") both eligible for asylum and entitled to withholding of deportation, the

---

**22.** In that regard the BIA did not opine on whether the harassment of Armenians rises to the level of persecution. As for the IJ, though he labeled the treatment of Armenians summarized in the background materials as "persecution or harassment," his decision seems to rest on the mistaken notion that no government nexus with the "persecution or harassment" was shown. Consequently, though *Fisher v. INS,* 79 F.3d 955, 961 (9th Cir. 1996)(en banc) teaches that deference is owed to a BIA determination as to whether acts rise to the level of persecution, it appears that no such determination was made in this case.

majority holds that there is "a *pattern and practice* of Armenian harassment in Russia," [maj. op. at 1201–02 (emphasis added) ], and that this "harassment . . . amounts to 'persecution,' " [*id.* at 1202]. I must respectfully dissent.

### I.

8 C.F.R. § 208.13(b)(2) provides that:

In evaluating whether the applicant has sustained his or her burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for persecution if:

(i) The applicant establishes that there is a pattern or practice in his or her country of nationality or last habitual residence of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable.

8 C.F.R. § 208.13(b)(2); *accord id.* § 208.16(b)(3) (withholding of deportation).

In *Kotasz v. INS*, 31 F.3d 847 (9th Cir. 1994), we explained this regulation to mean "that where members of a given group are systematically persecuted . . . proof of group membership suffices to establish a 'well-founded fear.' " *Id.* at 852.[1] As an example, we pointed to "the systematic attempt to annihilate the Jews in Nazi Germany." *Id.* ("Certainly, it would not have been necessary for each individual Jew to await a personal visit to his door by Nazi storm troopers in order to show a well founded fear of persecution."). In contrast, we noted that during the period of "widespread political violence" in El Salvador, "neither all Salvadorans nor all rebel sympathizers were systematically persecuted." *Id.* We confined viable "pattern or practice . . . of persecution" claims to "more extreme situations." *Id.; see also id.* at 853 (stating that "the problem of non-pattern and practice persecution . . . is far more common"). Moreover, it appears that there have been only two successful

---

**1.** The majority states that 8 C.F.R. § 208:13(b)(2) and "its explication in *Kotasz v. INS* " are "inapplicab[le] . . . to defeat Avetova's claim" because "Avetova's past experiences and Dr. Papazian's express affirmance as to her *personal* future risk plainly" show that "she would be singled out individually for persecution." [Maj. op. at 1201 (internal quotation marks omitted) ]; *see infra* Part II (finding that Avetova has not made the requisite showing of individualized persecution). This heavy reliance on Avetova's "past experiences" is a bit inconsistent with the majority's earlier holding that these same past experiences "do not amount to 'persecution' (that is, past persecution) within the meaning of the statute." [Maj. op. at 1197]. As for Dr. Papazian's "express affirmance," it is of course true that Dr. Papazian concludes that Avetova "would face a strong likelihood of persecution . . . if she were forced to return to the Russian Federation." In his affidavit, however, Dr. Papazian does not focus on Avetova's individual circumstances, but rather discusses what he views as a *"pattern* of persecution experienced by Armenians . . . in the Russian Federation," (emphasis added).

Other parts of the majority's opinion are not consistent with its express disavowal of any reliance on 8 C.F.R. § 208.13(b)(2) and its " 'pattern or practice' requirement." [*Id.* at 1201]. For example, at one point, the majority states that, for Avetova to succeed on her petition for review, "she merely has to demonstrate that Armenians are being systematically persecuted," [*id.* at 1198 n. 10 (citing *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir.1999)) ]. Systematic persecution is a requirement only of pattern-or-practice claims, which are governed by 8 C.F.R. § 208.13(b)(2). *See Kotasz*, 31 F.3d at 852–53. In addition, the section of *Mgoian v. INS* cited favorably by the majority rests entirely on 8 C.F.R. § 208.13(b)(2) and *Kotasz*. [*See* maj. op. at 1198 n.10 (citing *Mgoian*, 184 F.3d. at 1035) ]. Finally, at several places in its opinion, the majority appears to conclude that there is "an established current pattern of persecution" against Armenians in Russia. [*Id.* at 1201]; [*accord id.* at 1201 (stating that there is "a pattern and practice of Armenian harassment in Russia") ]; [*id.* at 1202 (stating that "the detention, intimidation and beatings of Armenians because of their ethnicity" amounts to persecution) ].

pattern-or-practice cases since the regulation was enacted ten years ago. *See Mgoian v. INS*, 184 F.3d 1029, 1036 (9th Cir. 1999) (finding "that a pattern of persecution targeting a given family that plays a prominent role in a minority group that is the object of widespread hostile treatment supports a well-founded fear of persecution by its surviving members"); *Osorio v. INS*, 18 F.3d 1017, 1031 (2d Cir.1994) (concluding "that union leaders like Osorio are at grave risk of persecution by Guatemalan authorities"); *cf. Chen v. INS*, 195 F.3d 198, 204 (4th Cir.1999) (holding that China's "one child" policy does not amount to a pattern or practice of persecution).

In this case, the evidence in the record does not compel the conclusion that there is a pattern or practice of persecution against Armenians in Russia.[2] The affidavit of Dr. Dennis Papazian, which the majority points to as "the most salient evidence as to Avetova's potential future in Russia," [maj. op. at 1200 n.18], admits as much. Dr. Papazian states that "some Armenians in the Russian Federation experience only mild discrimination, while others face life-threatening persecution without there being any distinction between the activities of the individuals concerned," and that "some Armenians" will continue to suffer persecution in Russia. In other words, the sworn statement of Avetova's own expert reveals that, because some Armenians are persecuted and some are not, Armenians in Russia do not face one of the "more extreme situations in which members of an entire group . . . are systematically persecuted." *Kotasz*, 31 F.3d at 852.[3] Accordingly, I must conclude that substantial evidence supports the BIA's finding that there does not "ex-

ist[ ] in Russia a pattern or practice of persecution of persons on the basis of Armenian ethnicity."

## II.

In *Kotasz*, we also noted that even if members of the disfavored groups are not threatened by systematic persecution of the group's entire membership, the fact of group membership nonetheless places them at some risk. That risk can rise to the level required for establishing a well-founded fear of persecution either as a result of an individual's activities in support of the group, or because the individual is a member of a certain element of the group that is itself at greater risk of persecution than is the membership of the group as a whole. *Id.* at 853; *accord Mgoian*, 184 F.3d at 1035 n. 4.

The majority points to three incidents, incidents that it finds "do not amount to 'persecution' (that is, past persecution) within the meaning of the statute," [maj. op. at 1201], that "coupled with the overall risks that Dr. Papazian had identified," [*id.* at 1197], compel the granting of Avetova's petition: "(1) [Avetova] was harassed and pushed by Russian officers because of her ethnicity; (2) [Avetova] could not get a job even though she had a diploma because 'there were no jobs for Armenians'; (3) [Avetova's] friend's daughter (who was Armenian) was raped and beaten by police officials," [*id.* at 1197–98 (footnote omitted)]. The harassment identified by the majority "falls far short of the required showing needed to compel a finding of persecution." *Khourassany v. INS*, 208

---

**2.** The record also does not compel the conclusion that there is systematic persecution against Mormons in Russia. As the majority does not address this argument, [*see* maj. op. at 1196–97 n.7], neither will I.

**3.** The majority correctly notes that a successful pattern-or-practice claim does not require "a showing of universality-a showing that *every* individual in the vulnerable group must face such serious persecution." [Maj. op. at

1201]; *see Makonnen v. INS*, 44 F.3d 1378, 1383 (8th Cir.1995) (holding that "to require a showing of persecution of all the members of the applicant's group represents an unreasonable reading of the 'pattern or practice' language"). A successful pattern-or-practice claim, however, does require a showing of "systematic persecution," *Kotasz*, 31 F.3d at 853; *accord Makonnen*, 44 F.3d at 1383. Avetova has not made such a showing in this case.

F.3d 1096, 1100 (9th Cir.2000) (holding that similar harassment was insufficient to establish past persecution or a well-founded fear of persecution); *accord Singh v. INS,* 134 F.3d 962, 967 (9th Cir.1998); *Prasad v. INS,* 47 F.3d 336, 339 (9th Cir. 1995); *Mendez–Efrain v. INS,* 813 F.2d 279, 283 (9th Cir.1987). The majority's assertion that Avetova "could not get a job" is belied by Avetova's own testimony, which reveals that she worked in Moscow at a hotel, as a babysitter, and as a cleaning woman, and "was getting by" economically. *Cf. Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969) (holding that "a probability of *deliberate imposition* of *substantial economic disadvantage* upon an alien" may constitute persecution). Finally, that Avetova's friend's daughter was raped, although deplorable, *see Lopez–Galarza v. INS,* 99 F.3d 954, 959 (9th Cir.1996) (noting that "rape can support a finding of persecution"), does not "mak[e Avetova] a more likely target for persecution." *Mgoian,* 184 F.3d at 1035 n. 4. Nothing in the record suggests, and nothing in the majority's opinion explains, why the rape of Avetova's "friend's daughter" on account of the "friend's daughter['s]" ethnicity should make Avetova, as opposed to any other Armenian in Russia, "more likely to come to the attention of the persecutors." *Id.; see also Kotasz,* 31 F.3d at 853–54 (explaining the individualized targeting requirement in non-pattern or practice cases).

Rather than demonstrating that Avetova was targeted for persecution in Russia, the evidence shows that (i) Soviet troops rescued her from Azerbaijan and brought her to Moscow; (ii) she had a residency permit for Moscow; (iii) unlike thousands of others from the Caucasus, she avoided expulsion from the Russian capital in 1993; (iv) she was able to obtain a passport to leave the country; and (v) Avetova's husband remains in Moscow and is receiving disability payments from the government. *Cf. Khourassany,* 208 F.3d at 1100 (denying Khourassany's petition for review because, inter alia, "some members of his family continue to live in Israel now and to operate businesses without interference" and because "Khourassany retained his passport and was able to travel freely within Israel and to leave Israel without hindrance"); *Rodriguez–Rivera v. INS,* 848 F.2d 998, 1006 (9th Cir.1988) (per curiam) (noting that "Rodriguez–Rivera obtained a passport from the government, and his family continues to live in El Salvador unmolested," and that "[t]hese factors are relevant in assessing a request for asylum or withholding of deportation and further undercut Rodriguez–Rivera's claims of a well-founded fear of governmental persecution").

### III.

For the foregoing reasons, I would deny Avetova's petition for review. Therefore, I dissent.