**Sayid Fazel Rabi HAMDANI,
et al., Petitioners,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

No. 02–71250.

INS Nos. A23–251–642/644,
A74–352–891/893.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 14, 2003.

Decided June 3, 2003.

---

132

Before TASHIMA, BERZON, and CLIFTON, Circuit Judges.

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

MEMORANDUM *

Sayid and Nasrin Hamdani, and their four children, Ali, Aaron, Madina, and Mariam, petition for review of the Board of Immigration Appeals decision affirming the denial of their petitions for asylum. Because the parties are familiar with the facts in this case, we recite them only as necessary. We deny the Hamdanis' petitions.

Petitioners concede their deportability pursuant to INA § 241(a)(1)(B), 8 U.S.C. § 1251(a)(1)(B), admitting that they are nonimmigrants who overstayed the period of their visitor's visas. The Immigration Judge granted Petitioners' request for withholding of deportation to Afghanistan and granted voluntary departure, with the United Kingdom designated as the country of deportation. Petitioners argue, however, that they should have been granted asylum, either from Afghanistan, or alternatively, from the U.K.

We agree with the BIA that Petitioners were firmly resettled in the U.K., so they are not eligible for asylum from Afghanistan. An alien shall not be granted asylum from one country if he or she was "firmly resettled in another country prior to arriving in the United States." INA § 208(b)(2)(A)(vi), 8 U.S.C. § 1258(b)(2)(A)(vi). "An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she [lived in another country with] an offer of permanent resident status, citizenship, or some other type of permanent resettlement...." 8 C.F.R. § 208.15. Petitioners were granted refugee status in Britain, and lived there for 15 years without restrictions on their residence or travel. They were able to secure employment, own a business, buy their own home, and

send their children to public school. Three of the Petitioners were born as British citizens. The entire family was issued government travel documents which permitted freedom of travel outside the U.K., as well as freedom to return. Based on these factors, Petitioners clearly met the 8 C.F.R. § 208.15(b) definition of "firm resettlement." An IJ "shall not grant asylum to any applicant who filed an application before April 1, 1997, if the alien ... was firmly resettled within the meaning of § 208.15." 8 C.F.R. § 208.13(c)(2)(I). Because the Hamdanis' asylum applications were filed before April 1, 1997, the denial of asylum from Afghanistan is mandatory under these regulations.

■ Petitioners argue alternatively that they are entitled to asylum from the U.K. as refugees under 8 C.F.R. § 208.13 due to their fear of persecution. Petitioners cite the murder of a nephew by racist "skinheads" or "British nationalists" and other vandalism and threats aimed at them. Though these actions were deplorable, we agree with the BIA's conclusion that "it does not appear from the record that the respondents were unable to avail themselves of the protection of the government of the United Kingdom." To the contrary, the British government took action against those responsible. The nephew's murder was investigated, and three of his attackers were put on trial and sentenced to life in prison. When Mr. Hamdani reported that his children had been harassed at school, the police arrested the perpetrators. Further weighing against Petitioners' claim are the facts that Mr. Hamdani's sisters (including the mother of the murder victim) have lived on the outskirts of London since 1992 without incident, and Mr. Hamdani has safely returned to Britain for months at a time since moving to the United States. Petitioners do not meet the definition of "refugee" as provided under 8 C.F.R. § 208.13.

The petitions are DENIED.

BERZON, J., dissenting.

I respectfully dissent. I would hold that on this record, petitioners established eligibility for asylum from the United Kingdom. Although the officials in the United Kingdom were apparently willing—to some degree—to protect the Hamdanis from persecution, they were not able to do so.

This court has held repeatedly that an asylum claim may be based on a government's inability to control persecution by non-government forces. *See, e.g., Chand v. INS,* 222 F.3d 1066 (9th Cir.2000); *Avetova–Elisseva v. INS,* 213 F.3d 1192 (9th Cir.2000). This court has reversed denials of asylum in several cases in which the government was not indifferent to, but was unable to stop, the persecution experienced by the asylum petitioner. *See Avetova–Elisseva,* 213 F.3d at 1198 (financially constrained Russian government grappling with high crime rate was unable to control anti-Armenian violence by private actors); *Gomez–Saballos v. INS,* 79 F.3d 912, 916–17 (9th Cir.1996) (Nicaraguan government was unable to control former National Guard members who threatened life of government appointee); *Lazo–Majano v. INS,* 813 F.2d 1432, 1434 (9th Cir.1987), *overruled on other grounds by Fisher v. INS,* 79 F.3d 955 (9th Cir.1996) (en banc) (viable asylum claim where persecutor was "a member of the Armed Force, a military power that exercises domination over much of El Salvador despite the staunchest efforts of the Duarte government to retrain it."); *McMullen v. INS,* 658 F.2d 1312 (9th Cir.1981), *superseded on other grounds by statute* (asylum claim could be stated for persecution by Irish terrorist organization).

Mr. Hamdani's testimony, along with numerous articles in the record, reveals the magnitude of the problem of sentiment against South Asian immigrants in the United Kingdom. The murder of Mr. Hamdani's nephew was no isolated event. The thousands-strong demonstrations in which the Hamdanis participated protested not only their nephew's death but the race-based murder of a young black man that had taken place a few months before in the London area. A newspaper article reported that the British Nationalist Party set up headquarters in South London, resulting in increased attacks in the area. A Muslim shopkeeper was brutally beaten, and Sikh and Hindu places of worship were firebombed. Within a few months of the murder of Mr. Hamdani's nephew, an Asian youth and an Asian taxi driver were killed for racial reasons in the same area. Mr. Hamdani testified that "you will see a lot of cases [of racist attacks like those on his nephew], without anybody be [sic] prosecuted."

The Hamdanis' asylum claim, however, is based on persecution of them, not of others. Years before his nephew's murder, Mr. Hamdani was accosted in the subway by nationalists and told to get out the country immediately. In another incident predating his nephew's murder, he was physically attacked while riding the subway. Mr. Hamdani stated that he did not report the physical attack to police: "[A] lot of people, they were telling me 'You have to be careful.' And if you report something, if you get caught, then you are ask for trouble, they come back for revenge."

After their nephew's murder, Mr. and Mrs. Hamdani participated in anti-racism activism and were quoted in newspaper articles discussing race-based violence in London. Mr. and Mrs. Hamdani and their son Ali were photographed as participants in anti-racist demonstrations. Their outspokenness made them visible targets. Someone broke into the Hamdani home and left a threatening note in language similar to that used by the Nationalists: "'You Pakis, you better leave Britain, it's not your home.'" "Skinheads" visited Mr. Hamdani's business several times in search of him; Mr. Hamdani was so frightened that he transferred the business to his friend and stopped going to work. The Hamdani children were harassed at school to such an extent that their parents felt it necessary to remove them from school. Apparently, although they did try, the police were unable to apprehend most of the perpetrators of various threats, harassment, and property destruction directed at the Hamdanis. Cf. Avetova–Elisseva, 213 F.3d at 1198 ("It does not matter that financial considerations may account for such an inability to stop elements of ethnic persecution. What matters instead is that the government is unwilling or *unable* to control those elements of its society committing the acts of persecution." (emphasis in original) (internal quotations and citation omitted)).

The net result of the threats and harassment was that the Hamdanis lost the ability to work, send their children to school, and live safely in the United Kingdom because the British government, despite its good-faith efforts, was simply unable to protect them. The Hamdanis did investigate moving elsewhere in the United Kingdom but were advised that matters were more difficult for South Asians outside London than in the city. To recognize in these unique circumstances the need for asylum from the United Kingdom does not open the floodgates to recognition of asylum claims from that country. I would

therefore find that the denial of asylum from the United Kingdom to the Hamdanis is not based on substantial evidence, and would grant the petition.