**Mohammed Azim FARUK; Althea Val Faruk, Petitioners,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 03–70342.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 2004.

Filed Aug. 4, 2004.

Parmjeet Kaur Randhawa, Law Office of Parmjeet Kaur Randhawa, San Francisco, CA, for the petitioners.

Peter D. Keisler, Assistant Attorney General, Civil Division; David M. McConnell, Deputy Director; and Jonathan F. Cohn, Counsel to the Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, DC, for the respondent.

Before B. FLETCHER, LEAVY, and BERZON, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge.

Althea Val Faruk ("Althea") and Mohammed Azim Faruk ("Mohammed") petition for review of the denial of their claims for asylum and withholding of removal. They claim that they were persecuted in Fiji because of their mixed-race, mixed-religion marriage. The immigration judge (IJ) found the Faruks' testimony credible, but held that the harassment, beatings, and death threats they experienced did not rise to the level of persecution, in part because much of the violence was instigated, threatened, or carried out by the Faruks' family members. The Board of Immigration Appeals (BIA) summarily affirmed. We grant the petition for review as to the asylum claim, deny the petition as to withholding of removal, and remand.

.

## I.

Althea Faruk is Christian and native Fijian. Mohammed Faruk is a Muslim of Indo–Fijian heritage. There are strong racial tensions in Fiji: According to the State Department Report in the record, native Fijians, almost all of whom are Christian, regularly persecute Fijians of Indian descent, most of whom are Hindu or Muslim. U.S. Dep't of State, *Fiji Country Report on Human Rights Practices for 1998* (Feb. 26, 1999), *available at* http://www.state.gov/www/global/human_ rights/1998_hrp_report/fiji.html. As a result of these tensions, when Mohammed and Althea began dating in 1992, their relatives and neighbors threatened them. Althea's father punched her when she refused to stop dating Mohammed. Her friends said they would "take the law into their own hands," and that she would be lucky if she got back to her house alive. She took the threats seriously, knowing that her friends had contacts who would carry out threats against an interracial couple.

When Mohammed's family and Muslim neighbors found out about the relationship, they found Mohammed in the middle of town and punched him. They shoved him into a car, took him to the house of another Muslim, and kept him there for half a day. Two of his abductors held Mohammed down while another punched and hit him. On another occasion, Mohammed's uncle, who was also his employer, threatened Mohammed's life if he continued seeing Althea.

For months, Mohammed and Althea knew that they were being closely watched. In August 1992, they went secretly to the capital city of Fiji and attempted to get a marriage certificate. The registrar refused to issue the certificate. When the couple left the registrar's office, a "whole bunch of Muslims" stopped them

and threatened Mohammed that if he got married they would beat him again. Mohammed and Althea were afraid that if they continued their relationship, one of them would be permanently harmed. Althea went to the United States. Mohammed followed her, in November 1992, and they resumed their relationship.

In the United States, an American pastor who was going to Fiji volunteered to perform their wedding ceremony in Fiji. They paid a Fijian to obtain a marriage certificate for them, and in early 1993 they were married in secret in Fiji. They wanted to remain in Fiji because it was home and they hoped that things would be better once they were married. Instead, Althea's family disowned her. Mohammed was fired from his job at the family business. The harassment continued. Every week, Muslims would come to their home, and tell Mohammed he had to leave his wife. Each time the Faruks went through town, people would call them names, threaten them, and throw rocks at their car. They tinted the windows of their car to avoid being seen, but people still recognized the car and threw stones. Mohammed hired a Fijian bodyguard for their safety.

The police refused to assist the Faruks. Mohammed called the police about the repeated stone-throwing, but the police would not file a report. In February 1993, when Althea was home alone, her two brothers and two other Fijians came and threatened her. Although an Indo–Fijian police officer arrived at the scene, he stood to the side when he saw how violent Althea's native Fijian attackers were. He told Althea point blank that he could not help her, even though he had back up in the police car downstairs. The attackers threatened the police officer, threw the Faruks' TV off the balcony, and only backed off from abusing Althea when two

civilian Fijians intervened. Soon afterward, the Faruks left Fiji without telling anyone and fled to the United States.

■ The IJ found the Faruks' testimony credible, but denied relief. The BIA summarily affirmed. We have jurisdiction under 8 U.S.C. § 1252 (2000). Because the BIA summarily affirmed, we review the IJ's opinion for substantial evidence. *Wang v. Ashcroft*, 341 F.3d 1015, 1019–20 (9th Cir.2003).

## II.

■ To be eligible for asylum, the Faruks must be unwilling or unable to return to Fiji because of past persecution or a well-founded fear of future persecution on account of a protected ground. 8 U.S.C. § 1101(a)(42)(A). "We have established that persecution 'for marrying between races, religions, nationalities, social group memberships, or ... political opinion is ... persecution on account of a protected ground.'" *Baballah v. Ashcroft*, 367 F.3d 1067, 1077 (9th Cir.2004) (quoting *Maini v. INS*, 212 F.3d 1167, 1175 (9th Cir.2000)). We must determine whether: (1) the Faruks experienced past persecution on account of their mixed-race, mixed-religion marriage that would give rise to a presumption that they have a well-founded fear of future persecution; and (2) the government of Fiji was unable or unwilling to control the Faruks' persecutors. *See id.* at 1074.

### A.

■ First, the IJ erred because he refused to consider the harm inflicted by the Faruks' relatives when he determined whether they experienced past persecution. There is no exception to the asylum statute for violence from family members; if the government is unable or unwilling to control persecution, it matters not who inflicts it. *See Rodas–Mendoza v. INS*, 246 F.3d 1237, 1239–40 (9th Cir.2001) (holding that threat from cousin was not persecution only because petitioner did not show that the government was unable or unwilling to control cousin); *Matter of S–A–*, 22 I. & N. Dec. 1328 (BIA 2000) (interim decision) ("[R]espondent established that she suffered past persecution in Morocco at the hands of her father and could not rely on the authorities to protect her.").

■ Considering the attacks on the Faruks by family members as well as by neighbors and strangers, we conclude that the Faruks experienced past persecution. Even where no individual incident may be sufficient to constitute persecution, past persecution can be established by the cumulative effect of multiple threats and attacks. *Baballah*, 367 F.3d at 1074 ("Threats and attacks can constitute persecution even where an applicant has not been beaten or physically harmed."); *Gonzales–Neyra v. INS*, 122 F.3d 1293, 1297 (9th Cir.1997) (granting withholding of deportation where petitioner had been threatened by Shining Path guerillas but not harmed); *Surita v. INS*, 95 F.3d 814, 819 (9th Cir.1996) (recognizing asylum eligibility for Indo–Fijian woman who was repeatedly robbed by ethnic Fijians because of her race).

Mohammed was abducted and beaten; Althea was physically attacked twice in her home, once while it was vandalized; they could not go anywhere without being verbally assaulted and assailed with rocks; Mohammed lost his job; they were denied a marriage certificate; and both were seriously and repeatedly threatened. *See Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1239 (9th Cir.1996) (holding that repeated harassment, vandalizing of petitioner's house, imprisonment of his brother, and a threat that he would experience "more

problems" was sufficient to establish past persecution). The cumulative effect of the threats and attacks on Mohammed and Althea is sufficient to establish past persecution.

### B.

 The Faruks' testimony also compels the conclusion that the government was unwilling or unable to control the persecutors. *See Singh v. INS*, 134 F.3d 962, 967 n. 9 (9th Cir.1998) ("Persecution need not be directly at the hands of the government; private individuals that the government is unable or unwilling to control can persecute someone."). Although they requested assistance from the police, the Faruks received none. A police officer absolutely refused to help Althea when she was clearly in danger, even though he could have called for the assistance of a fellow officer who was waiting in the police car. The police would not investigate the Faruks' reports of the recurring incidents of rock throwing, and the Faruks felt compelled to hire a private bodyguard for their protection.

### III.

 The IJ erred in failing to find that the attacks on the Faruks by their own family members were persecution and that the government was unable or unwilling to control them. The Faruks' testimony compels the conclusion that they suffered past persecution on account of their mixed-race, mixed-religion marriage. The government has not provided any evidence rebutting the presumption that the Faruks have a well-founded fear of future persecution. We hold that the Faruks are eligible for asylum. We remand for the Attorney General to exercise his discretion as to whether to grant asylum. *See Hoque v. Ashcroft*, 367 F.3d 1190, 1193 (9th Cir. 2004). However, we deny the petition for withholding of removal, as we do not consider the evidence strong enough to meet the higher standard for that form of relief.

**PETITION GRANTED IN PART AND DENIED IN PART, REMANDED.**