**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STANLEY ONUSU AFRIYIE, AKA
Stanley Owusu Afriyie,
                    *Petitioner,*

            v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 08-72626

Agency No.
A097-121-795

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 9, 2010—Seattle, Washington

Filed July 26, 2010

Before: A. Wallace Tashima, Raymond C. Fisher and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

10649

---

**COUNSEL**

James C. Daugherty, Seattle, Washington, for the petitioner.

Jonathan Robbins (argued), Achiezer Guggenheim, Tony West, and Mary Jane Candaux, Washington, DC, for the respondent.

---

**OPINION**

BERZON, Circuit Judge:

Under our immigration statute an applicant for asylum or withholding of removal can rely on persecution by private parties as a ground for relief from removal if he can show that the government of his country of origin is unable or unwilling to control that persecution. This case concerns the application of the unable or unwilling standard.

Stanley Afriyie, a citizen of Ghana, was persecuted by Muslims because he proselytized as a Baptist preacher in predominantly Muslim areas of Ghana. He fled to the United States and applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) denied his application for asylum and withholding of removal, concluding that Afriyie failed to show that the Ghanaian government was unable or unwilling to protect him and, in the alternative, that Afriyie could safely relocate in his home country. We conclude the BIA erred by denying Afriyie asylum and withholding of

removal, taking this opportunity to clarify the unable or unwilling standard applicable to nongovernmental persecution. In light of our analysis of the "unable or unwilling" asylum and withholding issue, we also remand Afriyie's CAT claim for further consideration of whether Ghanaian police acquiesced in Afriyie's torture.

## I.

Stanley Afriyie is a forty-one-year-old citizen of Ghana, born in that country's capital, Accra. Afriyie became a Baptist in 1999, and the following year began to preach the gospel, traveling from town to town. Afriyie later founded and led a five-member group called "Lack of Knowledge My People Perish." The group proselytized in Ghanaian villages on weekends in heavily Muslim areas, attempting to convert people to the Baptist faith.

Afriyie testified that his religious activities aroused anger in the Muslim population and that, as a result, he was targeted for persecution on account of his religion. His first difficulties, he stated, came in April 2002, when he and the group went to a predominantly Muslim village. Afriyie preached, using a microphone, in the street. The Muslim villagers became hostile, complaining about Afriyie's attempt to convert them to the Baptist religion, and, as time went on, some turned violent: They chased and attacked Afriyie and his fellow group members with sticks. Afriyie was beaten unconscious and went to the hospital for treatment, where he stayed overnight. The following day, Afriyie became fearful that his attackers would find him if he remained in the area, so he left the hospital even though he had been told that he would need to remain hospitalized for two weeks.

Afriyie reported this attack to the police, who were located near, but not in, the town where Afriyie had been beaten. The police officers asked Afriyie to complete a written report of the crime. Afriyie did so, describing the crime but noting only

the village in which the assault occurred, not the precise location. He did, however, give the police further details orally about the location of the crime. Afriyie testified at his hearing that although he later requested information about whether the police had investigated the assault, the police refused to disclose whether they had made any inquiries into the crime and, if so, what kind.

After the assault, Afriyie was afraid to preach in Muslim villages and so stopped proselytizing for a while. But, Afriyie testified, in time the Holy Spirit came to him when he was sleeping and urged him to begin proselytizing again. So, in March 2003, Afriyie and his group ventured into a different Muslim village, Aboabo. When Afriyie began preaching, a group of Muslim villagers opposed to attempts at conversion approached and warned him to stop his efforts. That night, Afriyie and his group stayed with a woman who offered them a room, but the home was invaded during the night and the group fled.

At some point—Afriyie did not say precisely when—Afriyie and his group asked the police for protection during their forthcoming preaching sessions, but the police had only one gun for the entire station. In any event, Afriyie testified, "[y]ou have to pay the police" to receive protection. Ordinarily, the police tell victims to get the culprits on their own and bring them to the police station.[1]

The same month as the Aboabo assault, three of Afriyie's four group members were murdered in separate incidents. One of the group members was stabbed to death one week

___

[1]The transcript records Afriyie's testimony in this regard indistinctly: "Where I come from, when[ ] it[ ] is a case concerning you, and then you go [to] the police station to report it, they'll tell you to bring the (indiscernible) and the taxi to the police station. It's not like here that you see police cars around everywhere." The Immigration Judge's opinion makes clear that the "indiscernible" word was "culprit."

after the Aboabo incident. The victim's household reported the murder to the police, who stated that they had no evidence to solve the crime.

After the stabbing, the remaining members of Lack of Knowledge My People Perish met to discuss whether to continue proselytizing. Soon thereafter, a second group member, Isaac, was the victim of a planned attack: he encountered a tree blocking the road while driving and was beaten to death by a group of six to twelve people with sticks when he left his car. Afriyie did not attend Isaac's funeral because he believed his own life was in danger. A third group member was murdered at night that same month. Afriyie believed that all three group members were killed by Muslim villagers.

After the three murders, Afriyie went into hiding. Soon thereafter, visitors came to Afriyie's village and set afire his sister's house, where he had previously been staying. Afriyie's sister and nephew were killed in the blaze. After the fire, Afriyie's mother called him and told him that "whatever [he] was doing [he] should put a[n] end to it because it burned [his sister's] house." The fire and resulting death of Afriyie's sister were reported to the police, but there apparently was no resolution to the case.[2] Baptist church elders then told Afriyie "that from the look of things [he] should leave town." Afriyie then fled Ghana, eventually arriving in the United States, where he applied for asylum, withholding of removal, and relief under the Convention Against Torture.[3]

Afriyie proceeded pro se in his immigration hearing, where

---

[2]The record is indecipherable as to whether the police inquired into the murder and arson. Afriyie was asked about this issue, but the response recorded is unclear: "They made inquires in that nothing (indiscernible) I haven't heard from them to."

[3]Afriyie filed his application before May 11, 2005, the effective date of the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231 (2005), so the REAL ID Act does not apply to this case.

he testified to the above facts. During the hearing, the government asked numerous questions about whether Afriyie could safely return to Ghana. Afriyie was sure he could not: "[I]f [he] were to go back the Muslims . . . [would] find out that [he was] there, [and] they[ ] [would] attack [him] again. . . . If [he] were to go to Ghana, once [he] start[s] preaching, then they'll know [him]." The government specifically asked Afriyie if he could do his missionary work in Accra; Afriyie responded that he had preached in a suburb of Accra but would be targeted anywhere in the country because of his reputation.

The government introduced two official reports to support its contention that Afriyie could relocate in Ghana: One, a Department of State report, indicated that Christians live throughout Ghana, making up 69 percent of the population, and that the majority of Muslims are concentrated in the northern part of the country and in urban centers, including Accra. The report indicated that Ghanaian authorities sought to protect religious freedom and "did not tolerate its abuse, either by governmental or private actors." In addition, a guidance document from the British Home Office stated that police in Ghana were criticized in 2004 for corruption and negligence, but that there were channels for complaints by the public against the police. As a result, the guidance document concluded, there was "no evidence that Christians and converts to Christianity are not able to seek and receive adequate protection from the state authorities."

The Immigration Judge (IJ) found Afriyie credible and concluded that he had suffered past religious persecution, relying on the incident in which Afriyie was beaten unconscious. Accordingly, the IJ determined, Afriyie was entitled to a presumption that he would be persecuted if he returns to Ghana. *See* 8 C.F.R. § 1208.13(b)(1). The IJ also decided, however, that "the evidence establishes the Government of Ghana would attempt to protect [Afriyie] from persecution on account of his religion," and that Afriyie would be able to

relocate to another part of Ghana where he would be safe from persecution.

As to the relocation issue, it is not clear on whom the IJ placed the burden of proof: The IJ stated, on the one hand, that "but for [Afriyie's] testimony, he offered no evidence that [relocation in Ghana] would not be reasonable," and noted that Afriyie "ha[d] not established by competent[,] credible objective evidence that he could no[t] relocate to be safe in Ghana." But the IJ later described his conclusion as "find[ing] that the Government ha[d] rebutted the presumption that the respondent could not relocate in Ghana to be safe."

As to withholding of removal, the IJ found that Afriyie necessarily failed to qualify, as the standard is more stringent than for asylum. Finally, the IJ denied Afriyie's CAT claim on the ground that Afriyie had not established either that Ghana would not protect him from torture or that it was more likely than not that he would be tortured if he returned.

Afriyie appealed to the BIA and moved before the Board to expand the record to include other documents describing country conditions in Ghana. The BIA determined that consideration of the documents would require additional fact-finding, and so, citing *Matter of Coelho*, 20 I. & N. Dec. 464 (BIA 1992), interpreted Afriyie's motion to expand the record as a motion to remand to the IJ. Finding that all but two of the documents were in existence before the hearing and could have been discovered and the two others were not sufficiently probative or likely to change the result, the BIA denied Afriyie's motion to expand the record.

Having done so, the BIA affirmed the IJ on all grounds but set forth its own reasoning in some respects. The BIA assumed that Afriyie's assault and the murders of others he described amounted to religious persecution but concluded that "the evidence does not establish that the government of Ghana was unable or unwilling to control the Muslim individ-

uals that attacked the applicant." In so deciding, the BIA relied on the facts that (1) Afriyie "never reported most of the[ ] incidents to the police, and that when he did report one attack, the police took his statement and created a written report"; (2) Afriyie was not able to identify his attackers or precisely where he was attacked, and so could not explain how he expected the police to protect him; and (3) Afriyie was "under the impression" the police would investigate the assault. Additionally, the BIA noted the country conditions evidence, citing the British Home Office report for the proposition that "internal security and police forces of Ghana operate effectively throughout the country, and that these forces effectively pursue and investigate claims of persecution at the hands of Muslims against Christians."

As an alternative to its "unable or unwilling" holding, the BIA "agree[d] with the Immigration Judge" that Afriyie could relocate in Ghana, noting that "[t]he documentary evidence of record establishes that Ghana is predominantly—perhaps even overwhelmingly—Christian, and that Muslim communities are limited to the northern areas of Ghana" and "in certain urban centers." The BIA went on to rely on the British report as "flatly conclud[ing] that 'safe relocation for Christians and converts to Christianity to a different area of the country to escape this threat of societal discrimination amounting to persecution at the hands of Muslims is . . . feasible.' "

After denying Afriyie's asylum and withholding claims on these bases, the BIA also denied, without elaboration, Afriyie's CAT claim. This timely petition followed.

## II.

"When the BIA conducts its own review of the evidence and law rather than adopting the IJ's decision, our review 'is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted.' " *Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010) (quoting *Hosseini v. Gonzales*,

471 F.3d 953, 957 (9th Cir. 2006)). We review the BIA's findings of fact for substantial evidence. *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995). We grant the petition only if the evidence compels a contrary conclusion from that adopted by the BIA. *Id.*

## A. "Unable or Unwilling"

Afriyie claimed that he suffered past persecution based on his religion. It was, therefore, his burden to demonstrate: "(1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Ernesto Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000) (internal quotation marks and footnotes omitted). The primary basis for the BIA's rejection of Afriyie's asylum claim was its conclusion that Afriyie failed to meet the last of these three requirements.

After examining the record, we cannot agree. The BIA made numerous factual errors in its "unable or unwilling" analysis, ignoring evidence favorable to Afriyie, misstating Afriyie's testimony, and improperly treating as irrelevant police reports made by individuals other than Afriyie. Because we conclude that a reasonable fact-finder would be compelled to conclude that the government was unable, or in the alternative unwilling, to protect Afriyie, we reverse the BIA as to this issue.

### 1.

**[1]** We begin by noting that reporting persecution to government authorities is not essential to demonstrating that the government is unable or unwilling to protect him from private actors. *See Rahimzadeh v. Holder*, slip op. at p. 10682-83 (9th Cir. July 26, 2010); *In re S-A-*, 22 I. & N. Dec. 1328, 1335 (BIA 2000); *see also Ornelas-Chavez v. Gonzales*, 458 F.3d

1052, 1058 (9th Cir. 2006) (so holding in the withholding of removal context). Rather, "the absence of a report to police . . . leaves a gap in proof about how the government would respond, which the petitioner may attempt to fill by other methods." *Rahimzadeh*, slip op. at p. 10683. The applicant may, for example, use generalized country conditions information to show that reporting such activity to the police would have been futile, *see Avetova-Elisseva v. INS*, 213 F.3d 1192, 1198 (9th Cir. 2000), or that doing so might have placed the applicant in greater danger, see *In re S-A-*, 22 I. & N. Dec. at 1333, 1335. At the same time, when an applicant attempts to report persecution to the police or request protection from them, the authorities' response (or lack thereof) to such requests may provide powerful evidence with respect to the government's willingness or ability to protect the requestor. *See Rahimzadeh*, slip op. at p. 10681-82; *Faruk v. Ashcroft*, 378 F.3d 940, 944 (9th Cir. 2004).

**[2]** Against this background, it becomes apparent that the BIA's first error was focusing exclusively on the police report Afriyie filed with regard to the attack on him. Even if Afriyie's ability to file a police report suggests that the police were *willing* to protect Afriyie, that says little if anything about whether they were *able* to do so. Authorities capable of taking a crime report may still be "powerless to stop" the persecution of which an individual complains. *Avetova-Elisseva*, 213 F.3d at 1198. Such an inability to provide protection may arise because of a lack of financial and physical resources or because of the character or pervasiveness of the persecution. *See id.*

In this case, the BIA ignored portions of Afriyie's testimony that specifically indicate the Ghanaian police forces lacked the resources necessary to protect him. Afriyie's group requested police protection while preaching, but the police had only one gun for the entire station and so could not provide the protection. Moreover, Afriyie testified that police expected individuals reporting crimes to track down and bring

in the perpetrators, additional evidence tending to show the inability of the police to investigate and solve crimes.[4]

[3] The BIA also erred by giving no weight whatever to the government's failure to solve other similar crimes against individuals associated with Afriyie or to provide protection when asked. The BIA emphasized that Afriyie himself reported only the beating he suffered, not the other crimes he described, namely, the murders of three of his group members and of his sister. However, Afriyie did testify that at least two of the other crimes were reported, even if not by him. As noted above, even general country conditions information, such as a report, might be relevant in the "unable or unwilling" analysis. Where, as here, an asylum applicant testifies to specific incidents in which individuals closely connected to the asylum applicant unsuccessfully sought police protection or investigation for crimes related to the ones against him, such testimony is certainly pertinent and must be considered. Afriyie asserted that the group's religious proselytizing caused the murders of his sister, nephew, and group members, and that this activity was also the basis for the assault against Afriyie and his fear of persecution. That at least two of these murders were reported to the police, with no apparent progress in solving them, is highly relevant evidence to the question whether Ghanaian authorities were unable, even if willing, to protect Afriyie from a similar fate.

---

[4]The BIA emphasized that Afriyie was "under the impression" the police would investigate the assault against him. However, the context of Afriyie's statement in this regard does not indicate that the police *actually* investigated the assault. During the hearing before the IJ, the government asked Afriyie whether he thought "the police in Ghana were that efficient that they could figure out where [he was] attacked and whom [he was] attacked [by] when [he] couldn't describe them." According to the transcript, Afriyie responded, "I was under the impression that the police was sending this case under investigators to the place and ask that on this day something happened. Do you know what happened?" Government counsel then changed course in its questioning.

**[4]** Taken together with Afriyie's testimony that Ghanaian police do not investigate crimes but instead expect crime victims to bring the perpetrators of crimes to the police, the evidence with respect to the murders and Afriyie's attack suggests that the police were unable to protect Afriyie.[5] We have so held under other circumstances in which there were several attacks on closely related people, none of which was solved. *See Mashiri v. Ashcroft*, 383 F.3d 1112, 1121 (9th Cir. 2004) (holding that the petitioner had shown that governmental authorities were unable or unwilling to protect her and her family where the police made no arrests after her husband was beaten, quickly closed their investigation on an attack on her apartment, and did not investigate her child's beating).

## 2.

The BIA also ignored Afriyie's testimony that even if the police *could* protect him if they so desired, they demand bribes for their services. Such evidence was corroborated by the government's own country conditions information and supports Afriyie's contention that the police were unwilling to

---

[5]We note as well that the BIA misstated the evidence with respect to Afriyie's police report concerning the assault against him. The BIA emphasized that Afriyie "conceded that his [police] report simply stated that the attack occurred in a city some 10 to 12 miles from the police station, and did not further specify the location of the attack." In so doing, the BIA ignored Afriyie's testimony that he supplemented his written police report with an oral statement in which he gave additional and specific details about the location of the assault. On this same point, the BIA's reliance on *Nahrvani v. Gonzales*, 399 F.3d 1148 (9th Cir. 2005), is misplaced. In *Nahrvani*, this court denied an asylum petition where the "German police took reports documenting [the petitioner's] various complaints" but the petitioner "did not give the police the names of any suspects." *Id.* at 1154. Critically, the petitioner's "assertion [that the German police failed to investigate] [wa]s directly contradicted by the testimony of his wife, who stated that the police investigated the complaints, but were ultimately unable to solve the crimes." *Id.* In this case, not only did Afriyie provide specific information with which the police could have investigated, there is no evidence to suggest that the police actually did so.

protect him in their governmental capacity, as well as unable to do so. *See Faruk*, 378 F.3d at 944 (holding that police were unwilling to protect petitioners where the petitioners "requested assistance from the police" and "received none").

### 3.

The BIA thus ignored or misstated critical, individualized evidence showing that the government of Ghana was either unable or unwilling to protect Afriyie. It instead relied on general country conditions information to conclude otherwise.

**[5]** The BIA was entitled to rely on all relevant evidence in the record, including reports, to determine whether Afriyie established persecution. *See Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002). The British Home Office report, however, upon which the BIA heavily relied, does not support the conclusion that the Ghanaian government was willing and able to protect Afriyie. The BIA cited the report for the proposition that Ghanaian police "effectively pursue and investigate claims of persecution" against Christians. In fact, the report refers to the "investigat[ion]" and "pursu[it]" of complaints only with respect to complaints alleging corruption lodged by the public *against the police*.

**[6]** Moreover, the report concluded only that there was "*no evidence* that Christians . . . are not able to seek and receive adequate protection from the state authorities," not that there was evidence that they do obtain protection. (Emphasis added.) Afriyie's individualized testimony, deemed credible by the IJ, provides such evidence, which the British report does not refute.[6] And aside from the British report, the BIA

---

[6]This gap would have been apparent to the BIA had it truly conducted an individualized review of how Afriyie's claim interacted with the country conditions information. The BIA must undertake an "individualized analysis" of a petitioner's claim when it reviews country conditions information introduced to rebut a presumption of future persecution. *Osorio v.*

cited only general statements from the Department of State that Ghana "generally respected [freedom of religion] in practice" and "sought to protect this right in full and did not tolerate its abuse." While this may be so generally, Afriyie has presented credible and direct evidence to the contrary in support of his claim that the police are unable and unwilling to protect him from private attacks on account of his religious activity. The BIA was not permitted to disregard that information on the basis of general country reports. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir. 1999).

**[7]** Given this state of the credited record, any reasonable factfinder would be compelled to conclude that the Ghanaian police were unable or unwilling to protect Afriyie. Because we conclude that the BIA's determination that Ghanaian authorities were willing and able to protect Afriyie is not supported by substantial evidence, we grant Afriyie's petition as to this ground. We remand for the BIA to consider whether Afriyie has otherwise established past persecution, as the BIA merely assumed, but did not decide, that Afriyie's assault and the murders he described amounted to religious persecution.[7]

## B. Relocation

We next consider whether we can uphold the denial of Afriyie's asylum claim on the BIA's alternative rationale that

---

*INS*, 99 F.3d 928, 933 (9th Cir. 1996). In that context, a "report on country conditions, standing alone, is not sufficient to rebut" such a presumption. *Molina-Estrada*, 293 F.3d at 1096 (citing cases). Here, although the BIA used country conditions reports to determine whether Afriyie established *past* persecution, it was similarly necessary for the Board to use that information in an individualized manner.

[7]There is an undertone in the IJ's remarks suggesting that Afriyie engaged in purposely provocative proselytizing and that such activity is not protected by the asylum statute. That reasoning did not serve as the basis of the IJ's decision or the BIA's affirmance. We express no view on the limits, if any, of religious practice as a basis for asylum protection.

Afriyie could, if returned to Ghana, safely relocate within the country and that it would be reasonable for him to do so. We conclude that we cannot.

**[8]** An asylum applicant who has established that he suffered past persecution is not entitled to asylum if an IJ finds by a preponderance of the evidence that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(1)(i)(B). There are thus two steps to the relocation analysis, the first focusing on "whether an applicant could relocate safely" and the second asking "whether it would be reasonable to require the applicant to do so." *Kaiser v. Ashcroft*, 390 F.3d 653, 659 (9th Cir. 2004); *accord Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008); *Gambashidze v. Ashcroft*, 381 F.3d 187, 192 (3d Cir. 2004).

To determine whether relocation would be reasonable,

> adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. These factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

8 C.F.R. § 1208.13(b)(3).

Here, the BIA's relocation analysis presumed that Afriyie had established past persecution. In that circumstance, the

government, not the asylum applicant, has the burden of showing that relocation is both safe and reasonable under all the circumstances. *Id.* § 1208.13(b)(1)(ii); *see also Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1090 (9th Cir. 2005); *Mashiri*, 383 F.3d at 1122-23. The BIA concluded that relocation would be safe and that it was reasonable to expect Afriyie to relocate.

**[9]** Afriyie argues that the BIA improperly placed the burden on him with respect to relocation. We cannot determine from the record whether that is true or whether the BIA considered the factors set forth in 8 C.F.R. § 1208.13(b)(3). We will therefore remand to the BIA to apply the proper standards in both regards. *See Silaya v. Mukasey*, 524 F.3d 1066, 1073 (9th Cir. 2008); *see also Ghaly*, 58 F.3d at 1430 (noting that the "Board [must] provide a comprehensible reason for its decision sufficient for us to conduct our review and to be assured that the petitioner's case received individualized attention").

**1.**

The BIA did not state who had the burden of proof with respect to relocation, but it expressed general agreement with the IJ on this issue. Yet, the IJ's opinion offers, at best, contradiction in this regard: The IJ initially stated that Afriyie "offered no evidence that [relocation in Ghana] would not be reasonable," and that Afriyie "ha[d] not established by competent[,] credible objective evidence that he could no[t] relocate to be safe in Ghana." These statements suggest that the IJ erroneously presumed that relocation was reasonable and improperly assigned the burden of proof to Afriyie to show otherwise. Toward the end of the IJ's opinion, though, he stated "that the Government . . . rebutted the presumption that the respondent could not relocate in Ghana to be safe," a statement consistent with placing the burden on the government. Because of the IJ's lack of clarity, and the BIA's failure to address the confusion, we remand to the BIA to ensure that

it evaluates the relocation issue in accord with the proper burden of proof. *See Silaya*, 524 F.3d at 1073.

**2.**

Even if we were to conclude that the BIA correctly assigned the burden of proof, we would grant Afriyie's petition and remand because we cannot determine whether the BIA considered the requisite regulatory factors pertinent to the reasonableness analysis.

**[10]** "[I]n making [the reasonableness] determination," the IJ and BIA were bound to "take into account the numerous factors for determining reasonableness outlined in 8 C.F.R. § 1208.13(b)(3)." *Knezevic v. Ashcroft*, 367 F.3d 1206, 1215 (9th Cir. 2004). Section 1208.13(b)(3) "*requires* the [adjudicator] to consider [a list of] nonexhaustive factors, to decide whether any of them ma[k]e relocation unreasonable." *Boer-Sedano*, 418 F.3d at 1090 (emphasis added); *accord Arboleda v. U.S. Att'y Gen.*, 434 F.3d 1220, 1226 (11th Cir. 2006) (holding that the BIA committed reversible error when it "did not mention any of the other factors it should have considered in making its [reasonableness] determination"). Neither the IJ nor the BIA discussed any of these factors before concluding that relocation was reasonable, despite the presumption of unreasonableness afforded Afriyie, nor did they cite to the regulatory subsection in which these factors are set forth.

**[11]** Because we cannot ascertain whether the BIA applied the appropriate legal standard, we must remand for clarification. We emphasize that on remand the BIA must place the burden on the government to show that relocation would be reasonable. *See Melkonian v. Ashcroft*, 320 F.3d 1061, 1070 (9th Cir. 2003). The BIA may look to any evidence introduced by Afriyie that bears on reasonableness. *See Boer-Sedano*, 418 F.3d at 1087, 1090-91; *Knezevic*, 367 F.3d at 1214-15. However, as with changed country conditions, "the presence of evidence *favorable* to [Afriyie] is not what is

determinative here; rather, the basis for [a] decision [on his asylum claim] is the absence of evidence refuting the regulatory presumption." *Ernesto Navas*, 217 F.3d at 662-63; *see also Mashiri*, 383 F.3d at 1123 & n.7 (considering evidence offered by petitioner who established past persecution but noting that "it was not her burden" to do so). Nothing in our case law required Afriyie to introduce such evidence, given the presumption of past persecution.[8] If the government's previously introduced evidence fails to rebut the presumption that relocation is unreasonable, the presumption must stand.

[12] The BIA failed to discuss the reasonableness factors set forth in 8 C.F.R. § 1208.13(b)(3) or discuss how the government met its burden of showing that relocation was reasonable. We therefore grant the petition and remand as to this point as well. *See Oryakhil*, 528 F.3d at 1000 (remanding for further proceedings where the BIA concluded that the IJ appropriately considered the reasonableness factors but "the record [did] not reflect that conclusion").[9]

---

[8]We note, however, that in most cases, applicants would be well-advised to offer preemptively such evidence if it is reasonably available: If an applicant does not assert past persecution or an IJ does not find that an applicant suffered past persecution, an applicant fearing persecution by private parties will have the burden of showing a well-founded fear of future persecution *and* that relocation would be unreasonable. 8 C.F.R. § 1208.13(b)(3)(i); *see also Melkonian*, 320 F.3d at 1070. Moreover, even an applicant like Afriyie who establishes or is presumed to have suffered past persecution should introduce evidence bearing on reasonableness with the expectation that the government will attempt to rebut the presumption that relocation is unreasonable.

[9]In the alternative, Afriyie asserted an asylum claim based on a likelihood of future persecution, without regard to past persecution. Afriyie would not be eligible for relief under this theory. The BIA rejected this portion of Afriyie's claim, determining that he would be able to relocate safely. Without demonstrating past persecution, Afriyie, not the government, had the burden of showing that relocation would not be safe or reasonable where the alleged persecutors were private parties. *See* 8 C.F.R. §§ 1208.13(a); (b)(3)(i). Given the sparsity of the evidence introduced by Afriyie on this point, we agree with the BIA that he did not meet his burden and so deny Afriyie's petition on this alternative ground.

### III.

**[13]** We also grant Afriyie's petition with respect to withholding of removal, and remand. As with asylum, to show past persecution, an applicant for withholding of removal must show that government forces have either directly persecuted him or were unable or unwilling to control private persecutors. *Ornelas-Chavez*, 458 F.3d at 1056. Moreover, also as with asylum, for the purpose of withholding a finding of past persecution triggers a presumption of future persecution. 8 C.F.R. § 1208.16(b)(1)(i). The government can rebut such a presumption by showing that internal relocation is both safe and reasonable under all the circumstances. *Id.* § 1208.16(b)(1)(i)(B); *see also id.* § 1208.16(b)(3) (outlining the same reasonableness considerations as exist in the asylum context).

**[14]** As we have indicated, any trier of fact would be compelled to conclude that the government of Ghana was unwilling or unable to protect Afriyie, and we cannot discern whether the BIA applied the appropriate burden of proof and considered the correct factors in its relocation analysis. Because the BIA used the same rationale to reject Afriyie's withholding and asylum claims premised on past persecution, we grant the petition as to the withholding claim for the reasons stated in Parts II.A and II.B. However, as with Afriyie's asylum claim, for which the BIA merely assumed past persecution, the BIA on remand may consider whether Afriyie has otherwise met his burden of proof to demonstrate past persecution for the purpose of withholding of removal.

### IV.

**[15]** We also grant Afriyie's petition with respect to his CAT claim, but to a more limited degree. The BIA was silent as to its reason for denying the CAT claim, so we look to the IJ's opinion "as a guide to what lay behind the BIA's conclusion." *Avetova-Elisseva*, 213 F.3d at 1197. The IJ denied the

claim based on his conclusion that "there [was] no evidence the Government of Ghana would turn a blind eye," even if Afriyie "were to establish that he might be tortured by Muslims on account of his prophesy." Because of the errors we identified in the IJ's and BIA's "unable or unwilling" analysis for purposes of asylum and withholding of removal, and given the substantial overlap of that evidence in the CAT context, we remand to the BIA for further consideration of CAT relief.

To be eligible for CAT relief, a petitioner must show that torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7); *see also Azanor v. Ashcroft*, 364 F.3d 1013, 1019 (9th Cir. 2004).

Contrary to the IJ's conclusion that there was *no* evidence in this regard, the record certainly contains evidence indicating that the government of Ghana was aware of the danger Afriyie was facing, yet unwilling to protect him. We have surveyed that evidence above with regard to the asylum claim and so need not do so again. The IJ's conclusion that Afriyie failed to show acquiescence, therefore, must be reconsidered in light of that evidence. We remand so that the BIA can do so, and can also determine whether, if the government acquiesced in torture, Afriyie has otherwise shown that he " 'more likely than not' " will be tortured if he returns home. *Wakkary v. Holder*, 558 F.3d 1049, 1067-68 (9th Cir. 2009) (quoting 8 C.F.R. § 208.16(c)(2)).

## V.

**[16]** Finally, we deny in part and grant in part Afriyie's petition with respect to his motion to expand the record,

which the BIA construed as a motion to reopen. The BIA did not abuse its discretion, *see Perez v. Mukasey*, 516 F.3d 770, 773 (9th Cir. 2008), in denying the motion to reopen to consider evidence available to Afriyie at the time of his immigration hearing. It was also within its discretion to deny the motion with respect to the new article entitled "Ghana, Africa: Islam Envelopes a Once-Christian Nation" and discussing persecution of Christians by Muslims. This article was not sufficiently probative such that it might have changed the outcome.

[17] We grant Afriyie's petition, however, and remand with respect to the motion to reopen to introduce the March 6, 2007 Department of State, Bureau of Democracy, Human Rights and Labor country report on Ghana. The report describes police corruption, use of bribes, and spotty investigation of complaints against the police. Such evidence appears relevant to government acquiescence for the purpose of Afriyie's CAT claim and the BIA's consideration of whether relocation would be safe and reasonable. Now that we have clarified the appropriate legal standards applicable to the relocation analysis and the evidence that must be considered for CAT relief, this article might be sufficiently probative to change the outcome of Afriyie's claims. We, therefore, grant Afriyie's petition in this narrow respect to give the BIA the opportunity to reconsider whether to admit that one article.

**GRANTED in part; DENIED in part; and REMANDED.** Costs are awarded to the Petitioner.